REMY, SCHMIDT & PLEISSNER v. HEALY.

1. Sales—Caveat Emptor—Warranty.
    A sale by sample, without fraud, gives rise to no implied warranty of fitness, quality or condition, and subjects the buyer to the common-law rule of *caveat emptor;* unless the seller is a manufacturer or grower or sells articles intended for food.

2. Same.
    Such sale is, however, subject to a warranty that the goods to be furnished shall equal the sample, which the buyer is bound to inspect as he is to inspect the goods when they are present.[1]

3. Same—Warranty—Quality.
    The theory upon which the warranty as to quality is implied against the manufacturer is that he must know his methods

[1] As to warranty on sale of goods by sample, see note to *Nixa Canning Co.* v. *Lehmann-Higginson Grocer Co.* (Kan.), 70 L. R. A. 653.

of manufacture and the purpose for which his product is designed, and may be properly held to have contracted to produce a merchantable article for such purpose.

4. SAME.
   A dealer who buys to sell again is not presumed to possess such knowledge.

5. WORDS AND PHRASES—MANUFACTURER.
   A manufacturer at common law is one who, through his skill and labor, shapes or combines material into a new product.

6. SALES—MANUFACTURERS—DEALERS.
   Importers of goods who receive lines of samples, by which they sell the goods, or who order by such samples and keep the goods in stock are not manufacturers within the meaning of the common-law rule.

7. CUSTOMS AND USAGES—SALES.
   A sale of shirt waists by sample is not subject to a custom to manufacture the goods with the warp lengthwise of the garment so as to relieve the buyer of his obligation to inspect.

8. SALES—FITNESS FOR USE.
   No warranty of fitness for wearing apparel can be implied.[1]

Error to Wayne; Murfin, J.   Submitted February 15, 1910.   (Docket No. 175.)   Decided May 7, 1910.

Assumpsit by Remy, Schmidt & Pleissner against Daniel J. Healy for goods sold and delivered. A judgment for plaintiffs on a verdict directed by the court is reviewed by defendant on writ of error. Affirmed.

*Navin, Sheahan & Bourke,* for appellant.

*Bowen, Douglas & Eaman (Edward F. Wunsch,* of counsel), for appellees.

HOOKER, J.   The plaintiffs were commission merchants in the city of New York. They were engaged in

---

[1] As to implied warranty of fitness of particular article purchased from a dealer for a particular use, see note to *Oil Well Supply Co.* v. *Watson* (Ind.), 15 L. R. A. (N. S.) 868.

As to implied warranty of fitness of a particular article purchased from a manufacturer or producer for a particular use, see note to *Leavitt* v. *Fiberloid Company* (Mass.), 15 L. R. A. (N. S.) 855.

selling ladies' wearing apparel, manufactured in Europe. They were wholesalers, and had samples of the lines of the manufacturer's goods sold by them, from which their purchasers gave orders, and from which they gave their own orders to the manufacturer in Europe. The defendant was shown samples of a line of ladies' shirt waists, and ordered a quantity. On their receipt, he paid a part of the purchase price and sold some of them, but afterwards discovered that they were unsalable for the reason that the embroidery was put on to run with the woof of the goods, instead of the warp. He returned the remainder to the plaintiffs, who returned them to defendant and he has since held them subject to their order. Defendant is unable to state that the goods received were not identical with the sample, but contends that it is difficult for an expert to tell without the most minute examination which way the warp and woof runs in a garment, and that therefore the defect was latent, that it is the general custom to embroider ladies' waists with the warp, and that, being made-up goods, the vendor necessarily knew the use to be made of them. Defendant denied his liability for the goods returned, and sought to recoup damages. A verdict was directed for the plaintiffs, and defendant has appealed.

It is a settled rule that one who buys an article which is present and subject to his inspection cannot afterwards assert an implied warranty of fitness, quality, or condition, in the absence of fraud, except possibly where the seller is the manufacturer or grower, or the vendor of articles intended for consumption as food; "*caveat emptor* is the invariable maxim." Mr. Mechem states that the rule of the common law is practically without exception that the buyer purchases at his own risk. 2 Mechem on Sales, § 1311. A note contains a long list of authorities supporting the text.

"The rule is not altered by the fact that the examination or inspection will consume time, or is attended with labor and inconvenience. No exception to it can be ad-

mitted except 'where the examination at the time of the sale is, morally speaking, impracticable. * * * The mere fact of the inspection being attended with inconvenience or labor is not equivalent to its impracticability. If the purchaser desire to avoid it, and yet obtain the protection it would afford him, he must do so by exacting from the vendor an express warranty of quality.' *Hyatt* v. *Boyle,* 5 Gill & J. (Md.) 110 (25 Am. Dec. 276). To the same effect is the language of Davis, J., in *Barnard* v. *Kellogg,* 10 Wall. (U. S.) 383." 2 Mechem on Sales, §§ 1311–1318.

Where the sale is by sample there is a warranty—sometimes called express and sometimes implied—that the goods to be furnished shall be equal to the sample, and that is the extent of the warranty. The purchaser is under the same obligation to examine and inspect the sample, as we have seen that he is to examine and inspect the goods when present at the sale. 2 Mechem on Sales, § 1320, and note. It stands to reason, and the authorities agree that ordinarily this is the extent of the warranty, where the sale is by a dealer. We held in *Kupfer* v. *Clothing Co.,* 141 Mich. 325 (104 N. W. 582), in an opinion by Mr. Justice BLAIR, that, "where an order for goods from samples is filled by the dealer with goods equal to the sample, the buyer is bound to be satisfied, and cannot reject them for defects in quality."

In making their case the plaintiffs called their business manager, who testified:

"I reside in New York. I conduct a fancy linen department for Remy, Schmidt & Pleissner, commission merchants. * * * As I picked up one sample, I would show it to Mr. Healy. He would take the goods in his hands, look at them, say, 'All right, give me so many of these, so many of those,' and so forth. This is the way Mr. Healy bought those goods. * * * The goods which were shipped corresponded with the samples in every detail. The goods which were sold to Mr. Healy were manufactured in foreign countries, and imported by Remy, Schmidt & Pleissner. * * * I am the manager of the linen department of Remy, Schmidt & Pleissner.

"*Q.* When an order comes to you for goods purchased of you by sample, what is the course that you take—I mean with reference to the manufacture of the goods? Mr. Healy comes to you, for example, gives you an order, what do you do then?

"*A.* It is all up to me. I am the man that runs the business.

"*Q.* Who is it that makes the goods for you?

"*A.* Manufactured on the other side by my direction.

"*Q.* What do you mean, across the ocean?

"*A.* Across the ocean, yes; imported stuff.

"*Q.* You give directions to them as to their manufacture, don't you?

"*A.* Yes.

"*Q.* Mr. Healy came to New York and selected these goods from you by sample?

"*A.* Yes, sir."

This was substantially all of the testimony on the subject.

Upon this testimony, it is now contended that the plaintiffs were manufacturers; *i. e.*, that "according to Mr. Ollendorf's testimony the waists were made according to his own directions so that his principals, the plaintiffs, stand in the place of the manufacturer." The term "manufacturer," in its ordinary acceptation, describes one who, through his skill and labor, shapes or combines material into a new product. Under various statutes, such as tax laws, the term may be extended and made to include others, for the purposes of such laws. Such cases are the following, relied on by defendant's counsel: *State* v. *Clarke*, 64 Minn. 556 (67 N. W. 1144), where the statute defined the term "manufacturer" for the purpose of taxation. *Hendy* v. *Soule*, Deady (U. S.), 400 (Fed. Cas. No. 6,359), which held that one having the entire control of the manufacture and sale of a patented machine was a manufacturer within a certain tax statute. *Commonwealth* v. *Manufacturing Co.*, 156 Pa. 510 (27 Atl. 13).

These cases are not in point on the question before us, which must be settled by the common-law rule as to what the distinction is between a manufacturer and a dealer.

The theory upon which the warranty as to quality is to be implied against the manufacturer, and not against the dealer, is that the former must know his own methods of manufacture, and the purpose for which his product is designed, and may properly be held to have contracted to produce a merchantable article for such purposes. See *Brenton* v. *Davis*, 8 Blackf. (Ind.) 317 (44 Am. Dec. 769); *Hoe* v. *Sanborn*, 21 N. Y. 552 (78 Am. Dec. 163). But a dealer—*i. e.*, one who merely buys to sell again (see *Norris* v. *Com.*, 27 Pa. 494; *Overall* v. *Bezeau*, 37 Mich. 506)—is not presumed to possess such knowledge. He is an intermediary between the manufacturer and the consumer. He is not dependent for his profits on the labor he bestows upon his commodities, but on his labor and skill and foresight in watching the market.

The contention that these plaintiffs were manufacturers appears to rest upon the claim that they directed and dictated the method of manufacture, and rests on no more substantial foundation than the answer, " Yes," made by Ollendorff to the question, " You give directions to them as to their manufacture, don't you ? " When this is read in the light of the other testimony, it cannot reasonably be inferred that he did more than to order from the foreign manufacturer a given quantity of waists of a certain pattern, a sample of which had been previously furnished them by the manufacturer, and shown to the defendant. The learned circuit judge did not err in instructing the jury that plaintiffs were merely dealers, and not manufacturers.

**Custom.** Counsel for defendant allege error upon the refusal of the court to permit evidence to prove that this sale was made with reference to a fixed custom of manufacture—*i. e.*, for the warp to run lengthwise and not crosswise of the garment—and that it was the practice of all merchants dealing in New York in relation to such goods to select only with a view to design, relying upon the custom of the manufacturers in regard to weave and texture. We understand this to mean that, in buying

these waists, defendant merely examined the pattern of the garment relying upon the alleged common custom of manufacturers to have the warp run up and down instead of around the garment, and therefore a warranty that they should be so made should be found, and, incidentally, that defendant should be excused for not examining the sample as to quality and merchantability. In other words, that this contract should not be construed as the law ordinarily construes it, but at variance with the usual rule of law applicable. Such a contention was made in the case of *Barnard* v. *Kellogg*, 10 Wall. (U. S.) 383, where it was claimed that, by the custom of merchants and dealers in foreign wool, there was an implied warranty that the same is not falsely or deceitfully packed. This claim was sustained in the trial court, but was reversed on review. The court, speaking through the late Mr. Justice Davis, said:

" It is to be regretted that the decisions of the courts, defining what local usages may or may not do, have not been uniform. In some judicial tribunals there has been a disposition to narrow the limits of this species of evidence, in others to extend them, and on this account mainly the conflict in decision arises. But if it is hard to reconcile all the cases, it may be safely said they do not differ so much in principle as in the application of the rules of law. The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence and contracted with reference to it. It is often employed to explain words or phrases in a contract of doubtful signification, or which may be understood in different senses, according to the subject-matter to which they are applied. But if it be inconsistent with the contract, or expressly or by necessary implication contradicts it, it cannot be received in evidence to affect it. ' Usage,' says Lord Lyndhurst, ' may be admissible to explain what is doubtful; it is never admissible to contradict what is plain.' *Blackett* v. *Assurance Co.*, 2 Cromp. &

J. 249. And it is well settled that usage cannot be allowed to subvert the settled rules of law. Whatever tends to unsettle the law, and make it different in the different communities into which the State is divided, leads to mischievous consequences, embarrasses trade, and is against public policy. If, therefore, on a given state of facts, the rights and liabilities of the parties to a contract are fixed by the general principles of the common law, they cannot be changed by any local custom of the place where the contract was made. In this case the common law did not, on the admitted facts, imply a warranty of the good quality of the wool, and no custom in the sale of this article can be admitted to imply one. 'A contrary doctrine,' says the court in *Thompson* v. *Ashton*, 14 Johns. (N. Y.) 317, 'would be extremely pernicious in its consequences, and render vague and uncertain all the rules of law on the sale of chattels.'

" In Massachusetts, where this contract was made, the more recent decisions on the subject are against the validity of the custom set up in this case. In *Dickinson* v. *Gay*, 7 Allen (Mass.), 29 (83 Am. Dec. 656), which was a sale of cases of satinets made by samples, there were in both the samples and the goods a latent defect not discoverable by inspection, nor until the goods were printed, so that they were unmerchantable. It was contended that, by custom, there was in such a case a warranty implied from the sale that the goods were merchantable. But the court, after a full review of all the authorities, decided that the custom that a warranty was implied, when by law it was not implied, was contrary to the rule of the common law on the subject, and therefore void. If anything, the case of *Dodd* v. *Farlow*, 11 Allen (Mass.), 426 (87 Am. Dec. 726), is more conclusive on the point. There forty bales of goat skins were sold by a broker, who put into the memorandum of sale, without authority, the words 'to be of merchantable quality and in good order.'

" It was contended that, by custom, in all sales of such skins there was an implied warranty that they were of merchantable quality, and therefore the broker was authorized to insert the words, but the court held the custom itself invalid. They say:

" 'It contravenes the principle, which has been sanctioned and adopted by this court, upon full and deliberate consideration, that no usage will be held legal or binding on parties, which not only re-

lates to and regulates a particular course or mode of dealing, but which also engrafts on a contract of sale a stipulation or obligation which is inconsistent with the rule of the common law on the same subject.'

"It is clear, therefore, that in Massachusetts, where the wool was sold and the seller lived, the usage in question would not have been sanctioned.

"In New York there are some cases which would seem to have adopted a contrary view, but the earlier and later cases agree with the Massachusetts decisions. The question in *Frith* v. *Barker*, 2 Johns. (N. Y.) 327, was, whether a custom was valid that freight must be paid on goods lost by peril of the sea, and Chief Justice Kent, in deciding that the custom was invalid, says:

"'Though usage is often resorted to for explanation of commercial instruments, it never is, nor ought to be, received to contradict a settled rule of commercial law.'

"In *Woodruff* v. *Merchants' Bank*, 25 Wend. (N. Y.) 673, a usage in the city of New York that days of grace were not allowed on a certain description of commercial paper was held to be illegal. Nelson, Chief Justice, on giving the opinion of that court, says:

"'The effect of the proof of usage in this case, if sanctioned, would be to overturn the whole law on the subject of bills of exchange in the city of New York;' and adds: 'If the usage prevails there, as testified to, it cannot be allowed to control the settled and acknowledged law of the State in respect to this description of paper.'

"And, in *Beirne* v. *Dord*, 1 Seld. (N. Y.) 95, the evidence of a custom that in the sale of blankets in bales, where there was no express warranty, the seller impliedly warranted them all equal to a sample shown was held inadmissible, because contrary to the settled rule of law on the subject of chattels. But the latest authority in that State on the subject is the case of *Simmons* v. *Law*, 3 Keyes (N. Y.), 219. That was an action to recover the value of a quantity of gold dust shipped by Simmons from San Francisco to New York on Law's line of steamers, which was not delivered. An attempt was made to limit the liability of the common carrier beyond the terms of the contract in the bill of lading by proof of the usage of the trade, which was well known to the shipper, but the evidence was rejected. The court, in commenting on the question, say:

" 'A clear, certain, and distinct contract is not subject to modification by proof of custom. Such a contract disposes of all customs by its own terms, and by its terms alone is the conduct of the parties to be regulated, and their liability to be determined.'

" In Pennsylvania this subject has been much discussed, and not always with the same result. At an early day the supreme court of the State allowed evidence of usage that, in the city of Philadelphia, the seller of cotton warranted against latent defects, though there was neither fraud on his part nor actual warranty. *Snowden* v. *Warder*, 3 Rawle (Pa.), 101. Chief Justice Gibson, at the time, dissented from the doctrine, and the same court, in later cases, has disapproved of it (*Coxe* v. *Heisley*, 19 Pa. 243; *Wetherill* v. *Neilson*, 20 Pa. 448), and now hold that a usage, to be admissible, 'must not conflict with the settled rules of law, nor go to defeat the essential terms of the contract.'

" It would unnecessarily lengthen this opinion to review any further the American authorities on this subject. It is enough to say, as a general thing, that they are in harmony with the decisions already noticed. See the American note to *Wigglesworth* v. *Dallison*, 1 Smith's Leading Cases, 545, where the cases are collected and distinctions noticed."

As said by 2 Mechem on Sales, § 1326, and shown by the above-cited case:

"How far usage may affect the question is not, perhaps, entirely settled. It is clear, however, that local usages cannot defeat the express terms of the contract, nor can they contravene the settled principles of the law. If, therefore, the sale was made under such circumstances that the law does not impute a warranty, usage will be ineffectual to add one; if, under the circumstances, the law does raise a warranty, usage will not be permitted to defeat it."

It is also urged that there was a warranty of fitness of the waists for the purpose for which they were made— *i. e.*, for use as wearing apparel—which use plaintiffs must have known to have been intended. We are of the opinion that this contention should not prevail.

In *Hudson* v. *Roos*, 72 Mich. 363 (40 N. W. 467), the mirror furnished had a latent defect. The court said that

the particular purpose for which she purchased was made known. This cause might apparently have been and probably was decided upon the points, *first*, that the glass furnished did not equal the sample; and, *second*, that it was or was not replaced within an agreed time within which plaintiff undertook to remove the latent defect through resilvering the mirror.

In the present case, while it cannot be denied that the vendor must have understood that waists were made for wear, that was not the particular purpose for which defendant purchased, if his purpose should make any difference. The waists were evidently purchased for sale, and while it is manifest that unfitness for wear would also militate against their sale, just as unfitness of any article for the use that it was designed for would necessarily impair its value in the market and perhaps to the extent of making it unsalable, the fact that a vendor who sells by sample must know that the goods are bought for the purpose of resale has not been considered sufficient to raise an implied warranty of fitness for use or sale, where the purchase is from a dealer. The cases cited, including our own later case of *Kupfer* v. *Clothing Co.*, 141 Mich. 325 (104 N. W. 582), indicate this. It would be hard to find a case closer in point than the one last cited. A dealer sold corduroy by sample. Its obvious purpose was to sell for clothing. Owing to a latent defect, it was worthless for this or any other purpose, and necessarily unmerchantable, but we held that equality to the sample was the extent of the warranty. See, also, the following cases cited by counsel: *Seitz* v. *Machine Co.*, 141 U. S. 510 (12 Sup. Ct. 46); *Pratt* v. *Metzger*, 78 Ark. 177 (95 S. W. 451); *Gossler* v. *Sugar Refinery*, 103 Mass. 334; *Wisconsin Red Pressed-Brick Co.* v. *Hood*, 54 Minn. 543 (56 N. W. 165).

We understand that the defendant bases his claim upon the proposition that the plaintiffs are to be considered the manufacturers of the waists. As a fact, it is self-evident that they have nothing to do with the manufacturing.

They are nothing more than dealers, who, receiving lines of samples of goods which the manufacturer makes, sell them by sample, and either carry them in stock, or order after sales are made. We think that such dealers cannot be called "manufacturers" in any sense, and we are aware of no case which would justify such a holding. We find nothing in the record that would justify the inference that the contract was one made with the foreign concern, through agents. It appears to have been an order given to dealers in this country, who obtain and import their goods to fill their orders from a foreign manufacturer or dealer.

To recapitulate, we find:

*First.* That these plaintiffs were dealers, and not manufacturers.

*Second.* That the sale was by sample, and no error is assigned upon the proposition that the goods furnished equaled the sample.

*Third.* Under the proofs, there was no warranty that the goods should be merchantable, or of their fitness for use by defendant's customers.

*Fourth.* No error was committed in rejecting the offered testimony of custom or usage.

The judgment is affirmed.

MOORE, McALVAY, BROOKE, and STONE, JJ., concurred.